IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

UNITED STATES OF AMERICA          *      October 11, 2016
                                  *
                                  *
VS.                               * CRIMINAL ACTION NO. W-11-CR-189
                                  *
JUAN FRANCISCO TREVINO CHAVEZ(3)

BEFORE THE HONORABLE JEFFREY C. MANSKE, JUDGE PRESIDING
DETENTION HEARING

APPEARANCES:

For the Government:          Mary Kucera, Esq.
                             Christopher Blanton, Esq.
                             Assistant United States Attorney
                             PO Box 828
                             Waco, Texas 76701

For the Defendant:           Rafael De La Garza, II, Esq.
                             Hilda Morales, Esq.
                             3941 Legacy Drive
                             Suite 204A-192
                             Plano, Texas 75023


     Proceedings recorded by mechanical stenography, transcript

produced by computer-aided transcription.

DEPUTY CLERK: Case No. W-11-CR-189, Defendant No. 3, the United States of America vs. Juan Francisco Trevino Chavez for detention hearing.

MS. KUCERA: Mary Kucera for the government, Your Honor. Good afternoon.

THE COURT: Good afternoon.

MR. DE LA GARZA: Good afternoon, Your Honor. Rafael De La Garza and Hilda Morales for the defendant.

THE COURT: All right. Will we be proceeding with the arraignment or has a waiver of arraignment been submitted?

MS. MORALES: We're waiving.

THE COURT: All right. Thank you.

Is the government ready to proceed on the detention hearing?

MS. KUCERA: We are, Your Honor.

THE COURT: All right. And on what basis will you be moving to detain the defendant today?

MS. KUCERA: We will be moving to detain based on the public dangerousness as well as flight risk and then just the nature and characteristics of the --

THE COURT: So the presumption, the risk of nonappearance and that the defendant is purportedly a danger to the community. Those are the three bases?

MS. KUCERA: Those are the three bases, Your Honor.

THE COURT: All right. Thank you. You may proceed by

calling your first witness.

MS. KUCERA:  Your Honor, the government's first witness is Gilberto Limon.

THE COURT:  Good afternoon.

As soon as Mr. Limon's seated, you may proceed.

MS. KUCERA:  Sir, would you -- do these not work anymore?

THE COURT:  I'm not sure, but I'd go ahead and try the one.

MS. KUCERA:  Okay.  I just realized that there's no longer a mic.

THE COURT:  Feel free to pick it up and hold it in your hand and use it to speak with if you like.  I know it's awkward, but go ahead.

MS. KUCERA:  Sounds kind of celebratoryish.

THE COURT:  I know, but that's okay.  You can do it.

MS. KUCERA:  I promise not to drop it though.

THE COURT:  That's all right.  Go ahead and that'll be easier and that way we can pick it up better if you hold it closer.

MS. KUCERA:  Okay.

DIRECT EXAMINATION

BY MS. KUCERA:

Q.   Sir, would you please state your name for the record?

A.   Yes, ma'am.  My name is Gilberto Limon, Jr.

Q.   And just for purposes of the record, can I have you

spell that?

A.    Yes, ma'am.  First name is Gilberto, G-i-l-b-e-r-t-o. Last name is Limon, L-i-m-o-n, Jr.

Q.    And, sir, how is it that you're currently employed?

A.    I'm currently with Homeland Security Investigations out of Laredo, Texas.

Q.    And how long have you been with Homeland Securities Investigations?

A.    Since 2003.

Q.    And prior to being with Homeland Security Investigations, did you work anywhere else in law enforcement?

A.    Yes, ma'am.  I was U.S. Border Patrol in the Rio Grande valley for five years and before that I was a police officer.

Q.    And specifically where have you been assigned with Homeland Securities Investigations, sir?

A.    In 2003 I started in San Antonio.  Then in 2006 I proceeded to Laredo, Texas.  In 2011 I worked out of the Assistant Attache Office in Matamoros, Mexico and I returned back to the United States in March of this year.

Q.    And starting in March of this year where is it that you have been assigned, sir?

A.    To the deputy special agent in charge in Laredo, Texas at the Attache Office.

Q.    Sir, are you familiar with the individual by the name

of Juan Francisco Trevino Chavez?

A.   Yes, ma'am.  I do.

Q.   And can you tell the Court how is it that you're familiar with Mr. Trevino?

A.   As working with Assistant Attache Office out of Mexico and out of Laredo, Texas I came to know that there were several open investigations on Mr. Trevino Chavez, also known as Kiko.

Q.   And specifically, sir, you indicated that you became aware of certain investigations involving Mr. Trevino Chavez. Can you tell the Court what was it that your understanding involving these investigations were?

A.   Drug smuggling and money laundering.

Q.   Did you have the opportunity when you worked at the Attache's office there to determine or to learn about who Mr. Trevino Chavez was?

A.   Yes, ma'am.  I did.

Q.   And based on your experience and the work that you were doing, can you tell the Court what it was that you ascertained about Mr. Trevino Chavez?

A.   Mr. Trevino Chavez, Jr. was a nephew of the -- at the time the leader of the Zeta cartel in Mexico by the name of Miguel Angel Trevino Morales.

Q.   And, sir, specifically about the Zeta cartel in Mexico, can you for the purposes of the record and the Court

explain what the Zeta cartel is?

A.   Zeta cartel started early 2000 as an enforcement branch for the cartel, the CDG cartel del golfo which is called the Golf cartel.  Originally the Zeta members were formed as an enforcement branch with the Golf cartel.  In later 2010, 2009 there was a conflict between the two cartels and the Zeta cartel branched off and formed their own cartel as far as smuggling marijuana, human trafficking, human smuggling.

Q.   Sir, and currently right now what's the state of the Los Zetas cartel?

A.   Currently the state I believe that they're split.  The Zeta cartel now is in conflict with themselves.  They split into two groups.  One is the old school Zetas and the cartel de noreste which is the northern cartel horte molitas.

Q.   And in regards to this cartel splitting, do you have any idea or information about who's in charge of the leadership involving the different cartels?

A.   Currently working out of the Assistant Attache Office I worked along with the Mexican -- the government of Mexico and they had currently the leader of the cartel de noreste as Mr. Juan Francisco Chavez Trevino, Jr.

Q.   Is Mr. Trevino Chavez known as anything in Mexico?

A.   He's known as the Comandante Kiko.

Q.   And for purposes of the record, what does that translate to, sir?

A.   This is commander.  Commander Kiko.

Q.   And why would he be referred to that way?

A.   The cartel de noreste as far as Miguel Angel Trevino is concerned, he is out of Laredo, Texas -- I mean -- I'm sorry.  Laredo, Mexico Tamaulipas.  And once the cartel split when the old school and the cartel de noreste, the northern cartel, cartel de noreste was originally from Nuevo Laredo. Since Mr. Trevino -- Miguel Angel Trevino Morales is originally from northern Laredo, his home base you would say is Nuevo Laredo, and once he was apprehended back in 2012, 2013, he put in charge people for the Zeta cartel that are from Nuevo Laredo, Tamaulipas.

Q.   Okay.  And specifically in regards to Nuevo Laredo who is it that your understanding that was in charge of that area?

A.   My understanding was Kiko.  Kiko Trevino.

Q.   And where did your information come from in regards to him being in charge of Nuevo Laredo?

A.   From the government of Mexico and the people I work with out of the Assistant Attache Office.

Q.   Okay.  And, sir, specifically speaking about the cartel, can you explain to the Court what are some of the current concerns as far as cartel violence and things of that nature?

A.   Cartel it's -- I mean, their main objective is, you

know, drug smuggling, kidnapping, extortion.  One of the problems we have along the border is spillover violence that comes through the United States and us as an agency as law enforcement agents we try to contain everything within the borders or in Mexico.

Q.   Okay.  And, sir, specifically in regards to Nuevo Laredo, did you have information in regards to Mr. Trevino Chavez or the defendant and his actions in Nuevo Laredo?

A.   Of course, I mean, this -- from sources -- I've heard from the government of Mexico and sources that -- and from Mr. Kiko Trevino that his uncles since they were in charge of Nuevo Laredo he was free to roam around the streets and do whatever he wants out of the respect for Mr. Zeta Corinta which is Miguel Angel Trevino Morales.

Q.   And based on the information you had, what were some of the things that Mr. Trevino Chavez was doing in Nuevo Laredo?

A.   According to sources in government Mexico officials, he was extorting people, drug smuggling, the money laundering to name a few.

Q.   Sir, do people fear Mr. Trevino Chavez in Nuevo Laredo?

A.   Yes, ma'am.  They do.

Q.   And, sir, do you have any information in regards to him being a suspect in any homicides down there?

A.   We always heard rumors that Mr. Trevino Chavez was involved in the homicide involving a U.S. citizen, his former girlfriend there in Nuevo Laredo, Mexico.

Q.   Sir, now, are you at all familiar with the government's case that's pending against Mr. Trevino Chavez?

A.   Very little, ma'am.

Q.   Okay.  And just for purposes of the record and for the Court's edification, can you basically describe a little bit about what your knowledge is of the government's case pending against the defendant?

A.   My understanding is that Mr. Trevino Chavez, Jr. was -- sells marijuana to several subjects in Laredo, Texas and in turn they pay the smuggling route.  That way the drugs can be smuggled into the United States and once in the United States the drug is smuggled up north further.

Q.   Okay.  And so was it your understanding that those drugs eventually ended up in Waco, Texas?

A.   Yes, ma'am.

Q.   Okay.  And, sir, have you had the opportunity to speak with some case agents that were more intimately involved with the government's case?

A.   Yes, ma'am.  I have.

Q.   And specifically did they indicate to you in regards to any of the witnesses how they knew Mr. Trevino Chavez?

A.   Yes, ma'am.  Briefly I've talked to the case agents

and they said that they know him personally.  They've gone to Nuevo Laredo.  They met with Mr. Trevino Chavez in Mexico and properly identified Mr. Trevino Chavez.

Q.   And further did those particular witnesses indicate as to Mr. Trevino Chavez' status and rank in the cartel?

A.   At the time?

MS. KUCERA:  Maybe -- Your Honor, I can rephrase that question?

THE COURT:  Sure.

BY MS. KUCERA:

Q.   Did they ever indicate if he was involved or tied to the cartel?

A.   Yes.  He was a member of the Zeta cartel at the time.

Q.   Sir, were you involved in the arrest of Mr. Trevino Chavez?

A.   Yes, ma'am.  I was.

Q.   Okay.  And did you have the opportunity to speak with Mr. Trevino Chavez at that time?

A.   Yes.  I did.

Q.   Okay.  And when you spoke with him, did he indicate to you in regards to who he was related to and what his identity was?

A.   Yes, ma'am.  He did indicate that he was the nephew of Miguel Angel Trevino Morales which is Zeta Corinta.

Q.   Okay.  And, sir, at the time of his arrest in

Baytown, Texas, were you able to ascertain how much currency he had on him?

A.   Yes, ma'am.  He had U.S. currency in cash approximately $11,600, more or less.

Q.   And, sir, I've got several exhibits that I'm going to ask to approach and have you take a look at.

MS. KUCERA:  Your Honor, can I do that at this time?

THE COURT:  Have you shown them to counsel already?

MS. KUCERA:  I have not, sir.  I can tender them now.

THE COURT:  All right.

MS. KUCERA:  And, Your Honor, in regards to these particular exhibits, the government is not asking them to be tendered into evidence, just for the Court to have an opportunity to look at them, and if the Court wants them into evidence, we would just ask that they would be sealed because of their sensitive nature.

MR. DE LA GARZA:  No objection, Your Honor.

THE COURT:  All right.  Thank you, Mr. De La Garza.

Mr. De La Garza, so the record can be complete, is it your preference that I just view them and tender them back to the assistant United States Attorney or would you prefer that they be sealed and made of record for this hearing?

MR. DE LA GARZA:  I think for the purpose of this hearing, Your Honor, that it's okay for you to (inaudible).

THE COURT:  All right.  I was just giving you the

opportunity if you so wanted them introduced.

All right.  Since he has no objection to me reviewing them, let me go ahead and take a look at them briefly.  That way I can at least better understand what they are and then you can proceed.

All right.  For the record the government has tendered for demonstrative and the Court's review purposes Government's Exhibit No. 1 which is a one page document, Government's Exhibit No. 2 which is a three page document.  Government's Exhibit No. 1 relates to various disputes.  Government's Exhibit No. 2 is in Spanish but appears to be -- oh, I won't speculate.  And No. 3 appears to be a diagram both pictorial and geographic as to the commanding control of the South Texas Northeast Mexico border as it relates to various organizations.

All right.  I'll tender those to the witness.

BY MS. KUCERA:

Q.   Sir, could you please explain Government's Exhibit No. 1?

A.   Exhibit No. 1 is a PowerPoint that was given to me by the government of Mexico indicating several narco blankets which say that disputes the territory in Nuevo Laredo.

Q.   Are these narco blankets, are they common?

A.   They're common related to the cartel.  Yes, ma'am.

Q.   And what is their purpose of these narco blankets?

A.   To send a message to the rival cartel.

Q.   And specifically in the one photograph there's one that refers to -- is there one that refers to Mr. Trevino Chavez?

A.   Yes.  On March 9th, 2016 there were two narco blankets that were placed in which the cartel de noreste reiterate its presence in Victoria, in Ciudad Victoria, Tamaulipas that remains under the control of the command under Kiko Trevino, Sr.

Q.   Okay.  In regards to that being placed there, what purpose does that serve?

A.   It's relaying a message that they're -- the cartel de noreste, the northern cartel, is -- still has presence in Ciudad Victoria.

Q.   And, sir --

A.   And still has command.

Q.   Okay.  Thank you, sir.

On Government's Exhibit No. 2 --

THE COURT:  For my own personal curiosity, what's the significance of it being placed on a blanket?

THE WITNESS:  Usually when narco blankets or narco blankets are placed, they're placed with dead bodies, pieces of dead bodies just to send a message saying, we're here.  I mean, stop doing what you're doing and -- because we're going to take over the plaza.  The plaza in Ciudad Victoria or Nuevo Laredo.

THE COURT:  All right.  Thank you.

You may proceed.

BY MS. KUCERA:

Q.   And, sir, Government's Exhibit No. 2, I know that it's in Spanish.  Are you a fluent Spanish speaker?

A.   Yes, ma'am.

Q.   Can you explain to the Court what Government's Exhibit No. 2 represents?

A.   No. 2 represent the criminal history of Mr. Juan Francisco Trevino Chavez, AKA Commander Kiko in Mexico.

Q.   And where was it that that particular document came from?

A.   It came from the office of -- the PGR office in Mexico.

Q.   And, sir, there are some redactions that have been made on that document.  Specifically are people concerned for their safety involving individuals especially people like Mr. Trevino Chavez?

A.   Yes.  A lot of -- I've talked to a lot of government officials in Mexico who are very concerned if their name comes out in any official documents that are presented in the United States in fear of retaliation.

Q.   And, sir, finally Government's Exhibit No. 3, can you tell the Court what the -- what that reflects?

A.   This reflects the command structure of the cartels currently referring to the cartel de noreste, the CDN, which is

the northern cartel and the Golf cartel.

Q.   And specifically on that chart does it indicate if Mr. Trevino Chavez has any control and at what point is -- he has control?

A.   Yes, ma'am.  It shows that he's one of the leaders of the cartel de noreste CDN.

MS. KUCERA:  Pass the witness, Your Honor.

THE COURT:  All right.  Cross-examination, Mr. De La Garza?

MR. DE LA GARZA:  May it please the Court.

CROSS-EXAMINATION

BY MR. DE LA GARZA:

Q.   Special Agent Limon, a few follow-up questions if I may.

The information you have is based on information that you have learned from other individuals; is that correct?

A.   Yeah.  That's correct, sir.

Q.   Nothing that you have obtained from firsthand knowledge or firsthand seeing something, hearing something or interpreting something that you have firsthand knowledge of; is that correct?

A.   That's correct, sir.

Q.   The information you have from your Mexican sources, if I may, are agents or officers of Mexico that use different means to gather information than what we do in this country;

isn't that correct?

A. They gather the information basically the same way we gather it, through informants, through investigations. Yes. That's correct.

Q. And they also use other means such as torture or etcetera to gather information that we obviously don't do in this country; isn't that correct?

A. I have no idea, sir.

Q. So the information that you understand to have based on these other individuals is basically a lot of rumor, hearsay, if you will, as to the acts of my client, nothing specifically; isn't that correct?

A. Nothing that I've witnessed. No, sir.

MR. DE LA GARZA: Pass the witness, Your Honor.

THE COURT: All right. Thank you.

Redirect?

MS. KUCERA: Nothing further from this witness, Your Honor.

THE COURT: All right. You may step down, sir. Thank you.

You may call the next witness.

MS. KUCERA: William Hicks, sir.

(The witness was sworn.)

DIRECT EXAMINATION

BY MS. KUCERA:

Q.   Sir, would you please state your name for the record?

A.   William Hicks.

Q.   And how are you currently employed, sir?

A.   U.S. Marshal Service out of Waco, Texas.

Q.   And how long have you been employed in that capacity?

A.   Eight years.

Q.   And did you work anywhere previously in law enforcement?

A.   I did six years at a local PD and I've also done approximately six or seven with ICE and what's formerly known as U.S. Customs in El Paso, Texas.

Q.   Sir, are you familiar with the individual known as Juan Francisco Trevino Chavez?

A.   I am.

Q.   And how are you familiar with him, sir?

A.   Warrant was issued out of this Court back in 2011. Started looking into this case.  At the time found out that Mr. Trevino was in Mexico.  We have deputy U.S. marshals that work with the Mexican government to help us locate fugitives in Mexico.  He was located in Mexico and at that time were unable to get him out of Mexico.

Q.   And, sir, while he was incarcerated in Mexico -- and was that roughly the summer of 2012?

A.   Yes.

Q.   Do you know if anybody went and spoke with him from

Homeland Securities Investigations?

A.   Yes.  Agent Raul Nava.  I've talked to him extensively about this and he told me that he went down and talked to Mr. Trevino in prison when he was there 2012.

Q.   And in your conversations with Agent Nava were you able to ascertain what his purpose was on going to see Mr. Trevino Chavez?

A.   He went down there with another agent.  He found out that he was in jail.  Mr. Trevino Chavez, his parents are from Mexico so he can derive Mexican citizenship which sometimes makes it more difficult to get people back to the U.S.  He was trying to go down there in the hope to get him to sign a waiver of extradition to come back to the U.S. for these charges.

Q.   And specifically in those discussions with Mr. Nava, did he explain to you that he -- what he did when he went down there to make the defendant aware of these charges?

A.   I believe he took either a copy of the warrant or an indictment and showed Mr. Trevino, this is what you're facing.

Q.   Did -- was Mr. Nava or Agent Nava successful in that attempt?

A.   He advised me he did talk to Mr. Trevino but he was unwilling to sign the paperwork to come back to the U.S.

Q.   Over the course of the five years that you had the warrant, was there a lot of time and resources expended on trying to find Mr. Trevino Chavez?

A.   There was.  He was -- you know, we had him placed down up in other towns Piedars Negras which is across from Eagle Pass south to Laredo and several points in between during that span.

Q.   And just for purposes of the record and for the Court's information, was this a warrant that you put a lot of time and effort into in trying to get executed?

A.   Yes, ma'am.

Q.   Okay.  And specifically were you involved in the execution of the warrant two weeks ago?

A.   I was.

Q.   Okay.  And specifically based on the information that you had, did you make any -- take any additional precautions when it came to Mr. Trevino?

A.   I did.  It was learned that he was possibly back in the United States.  Investigation was started, you know, a couple of months ago.  Once we believed he was here and prior to the execution of the warrant, we employed the use of a SWAT team or SRT team, multiple investigators just because of what was believed or known to have happened in Mexico.

Q.   Did you believe that Mr. Trevino Chavez was dangerous?

A.   We did.  His -- his relationship because he is -- his father was currently or is out now but was incarcerated in the U.S. for smuggling his uncles Miguel and Omar are known as Z40

and Z42, and as the other agent described it's been a bloody blood bath in Mexico for control of basically the drug routes to the U.S.

Q.   Okay.  Sir, do you believe that this individual's a flight risk?

A.   I do.

Q.   And, sir, specifically did you have the opportunity to speak with Mr. Trevino Chavez when you arrested him?

A.   I did.

Q.   Okay.  And did he make any indications that led you to believe that he was -- that he did hold knowledge as to the Zeta cartel?

A.   He did.  We had a conversation on the way back from Houston to Waco.  At one point I actually asked him does he feel safer here in the U.S.  He said yes, he does.  And I asked him why didn't he feel safe in Mexico and he said, they're trying to kill me in Mexico.  I said, who?  He said, the CDN. I said, why are they trying to kill you?  He says, other cartels believe I'm the leader.  Actually it wasn't the CDN trying to kill him.  It was another cartel trying to kill him and I asked why.  He says, well, they think I'm the leader of the CDN.  I said, are you?  His response was no.

Q.   Sir, did -- but did he know information in regards to certain other individuals that were -- had numbered ranks within the Zeta cartel?

A.   Yes.  Kind of asked about other numbers.
Specifically Z46 was brought up.  As to him he denied being Z46
and said that was a subject from Laredo but he's already been
killed at this point.

MS. KUCERA:  Pass the witness, Your Honor.

THE COURT:  All right.  Cross-examination?

CROSS-EXAMINATION

BY MR. DE LA GARZA:

Q.   Marshal Hicks, I've got some follow-up questions for
you.

A.   Yes, sir.

Q.   What time period were you in El Paso by the way?

A.   2003 to 2008.

Q.   Special Agent Hicks, on the day of the arrest of my
client, would it be fair to say that he was cooperative with
you and the agents, he did not resist, try to run over anybody,
anything like that, did not call for reenforcement, help or
anything like y'all were perhaps fearing that he might do?

A.   Correct.

Q.   And in fact as you mentioned on his way back to here
with you he mentioned that he was fearful that if he goes back
to Mexico he might be killed; is that correct?

A.   Yes, sir.

Q.   So the likelihood of him fleeing to Mexico would be
unlikely.  Wouldn't that be correct?

A.    I would not say that.

Q.    So even though he's fearful of being killed in Mexico, he would still run back to somewhere where he feels dangerous?

A.    He's been there a long time, is still around.  So that's why I believe he could assimilate back into there.

Q.    But he obviously left Mexico for a particular purpose; isn't that correct?

A.    Correct.

Q.    And during the time that you have spent investigating my client, there's no specific information that you have that he has any specific intent to flee or anything like that, is there?  Just what y'all might think or believe?

A.    In my experience when we did start to follow him the day of the arrest, he proceeded to do what we call heat runs, stopping, starting, pulling around, turning around until he was -- that's what triggered the takedown.

Q.    Right.  But in all fairness, when y'all were following him, you weren't in marked cars, were you?

A.    Correct.

Q.    You were in regular trucks, armored trucks or vehicles and he wouldn't have known who you were until at some point he figured it out and then stopped and complied; isn't that correct?

A.    That is correct.

MR. DE LA GARZA:  That's all I have, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.

Redirect?

REDIRECT EXAMINATION

BY MS. KUCERA:

Q.    Sir, do you believe that Mr. Trevino Chavez' statements about his feelings towards Mexico, do you think that neutralizes him as a threat?

A.    No.

Q.    And do you think that neutralizes his ability to be a flight risk?

A.    Absolutely not.

Q.    And based on your experience with fugitive apprehension and just the information that you obtained from working in border posts, how does the cartel work as far as who's in command?

A.    At the time of the warrant issued he -- his uncles were actually in command.  They had been removed and caught.  Other people have been killed.  So what happens is someone gets caught or killed, someone steps up.  They get caught or killed, someone steps up.  And there's a rival.  There's a split.  They don't get along.  So they split factions.  So it's always evolving on who is on top and who is taking out who.

Q.    And as far as that evolvement and the rivalry that

goes on, is that day to day?

A.    Absolutely.

Q.    And specifically in this particular case although Mr. Trevino Chavez has made statements to you about feeling fearful about going to Mexico, could that fear change?

A.    It could.  I mean, if the rivals got taken out, there would be no fear.

Q.    Could Mexico once again offer him a safe place for him?

A.    Correct.

MS. KUCERA:  Pass the witness, Your Honor.

THE COURT:  Sure.  That's fine.

MR. DE LA GARZA:  Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. DE LA GARZA:

Q.    Agent Hicks, wouldn't it be fair to say that y'all also have him in protective custody at this point in time? Isn't that correct?

A.    As protectorate of the Court and even prisoners, that is fair to say because there could be known or unknown hits from other cartels that someone might want to try to take him out in prison since they know where he's at.

Q.    And from conversations we've had with your office, would it be fair to say that -- and I'll paraphrase from my client -- that he has asked you all to do what you can just to

have him put in the general population, that he doesn't want to be in protective custody but I believe y'all referred us over to the warden of the jail at this point in time?  Is that kind of the procedure?

A.   It is and we had a conversation, I did with your client on the way up here.  He said he wouldn't have any problems, but as we passed Highway 6, he actually asked, is that the jail, and I said, yes.  He asked me whether he thinks he should go into general pop or not and I told him the same thing.  I said, depends who you are and if someone wants to make name for themselves, you know, and that's where we kind of left it at that.  All that was relayed to the warden because of his family tree and his family history and I believe they're the ones -- I'm not the one that's in charge of --

Q.   Right.  But at this point in time are y'all aware of any specific threats against him that can be carried out at that facility or anywhere within y'all's custody?

A.   That's kind of hard to say because there -- you know, we do see the banners of the matas as well and there's some out there offering a million dollars for a Trevino.  So if that was to get up here, we would have no choice but to put him in protective custody.  So that's -- I don't know if that helps answer your question or not, but...

Q.   Close enough.

MR. DE LA GARZA:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Anything further?

MS. KUCERA:  Nothing further from this witness, Your Honor.

THE COURT:  All right.  Thank you, Marshal Hicks.  You may step down.

MS. KUCERA:  Your Honor, at this time the government would rest subject to any rebuttal.

THE COURT:  All right.  Does the defense have any evidence it wishes to offer at this time?

MR. DE LA GARZA:  No, Your Honor.

THE COURT:  All right.  Does the government have any argument it wishes to make?

MS. KUCERA:  Briefly, Your Honor.

Your Honor, in this particular case the government is seeking detention prior to trial and the government believes that we've met the burden.  This defendant did not interview with Pretrial Services so there's no Pretrial Services' report really for the Court to rely upon which I know makes it extremely difficult to make an assessment as to whether or not the defendant is a candidate for something less than detention for pretrial purposes.  The government points to the dangerousness of this particular defendant and the facts and characteristics involving this defendant which can all be taken into consideration as well as the flight risk.  This was a

very -- this warrant was five years old. You heard the testimony from Deputy Hicks that he worked very hard to get it executed. We do fear that the defendant could be a flight risk and we do believe that with the cartels the situation is day to day and just because an individual can say that they don't feel safe in a foreign country or Mexico at this time doesn't mean that tomorrow, next week that that situation would change. It's a very volatile day-to-day situation and the government believes based on the facts in evidence before the Court today that the government has reached the burden necessary for seeking detention on this particular defendant, and if -- I've got Government's Exhibit No. 1 through 3 if the Court would like to look at those in any more detail.

THE COURT: No. I've reviewed them sufficiently. Thank you.

Mr. De La Garza, do you have any argument you wish to make?

MR. DE LA GARZA: Briefly, Your Honor. The facts are what they are, Your Honor. I have no real substantive argument other than I would ask the Court if we could seal the records of these proceedings. I do know that there are prying eyes that like to look at transcripts and record and I would just rather keep all that under wraps unless someone has a compelling reason and asks permission from the Court, then we'll know who wants to look at the records and I would ask

that the records of our testimony -- of the testimony be sealed from today's hearing, Your Honor. That's all I have.

THE COURT: All right. My concern with respect to that is the open courts of the United States and this hearing itself was not sealed beforehand and there have been members of the public in the courtroom, a member of the bar but nonetheless a member of the public. What's the government's position with respect to that? If there's an agreed motion to seal, I will consider it. If it's not, I'll take it under advisement.

MS. KUCERA: Your Honor, at this time the government has no objection to that. The defense counsel did not seek that prior to because we could have potentially have worked something out and tried to make that request to the Court. I think probably defense counsel's concern is there have been several things that have been put online, including the defendant's indictment, the arrest warrant and things of that nature. I'm not sure if the Court is aware of that, but --

THE COURT: No.

MS. KUCERA: -- the government is and I can provide those web sites.

THE COURT: Where have those things been placed?

MS. KUCERA: Your Honor, I believe it was on border -- borderlandbeat.com and breitbart.com.

THE COURT: And what are those web sites?

MS. KUCERA: They are just borderland -- my understanding

is, sir, that they have to do with basically following narcotics trafficking and things of that nature and it is the on there.  Yes, sir.

THE COURT:  What are they?

MS. KUCERA:  If you -- it's -- if you -- it's borderlandbeat.com and if you Google Kiko Trevino it will come up, sir.  And Kiko is K-i-k-o.

Your Honor, would you like to hear from Deputy Hicks about that?  We can put on some testimony if you'd like to hear about what type of web sites these are.

THE COURT:  I can get there real quick no problem.

MS. KUCERA:  Okay.

THE COURT:  All right.  In light of the fact that there is agreement that the transcript and record of this hearing be sealed, the Court will order that it be sealed pending further order of the Court subject to objection being raised.  If an objection is raised by a third party and they have standing to raise that objection, then we will have a hearing as to whether or not it should remain sealed.  Fair enough?

MS. KUCERA:  Thank you.

MR. DE LA GARZA:  Fair enough, Your Honor.

One additional matter before you make your ruling.  Again as the Court is aware through my cross-examination of Agent Hicks, my client is asking that he be taken out of the protective custody status over at the jail here off of Highway

6 and be allowed to be in general population.  He understands the risks associated with that, but being in a cell by himself I think after two weeks is -- although the facilities have been very amenable, has allowed him to -- it took about a week but to allow him to have, you know, visitation and phone calls, etcetera, but still being by himself is something that he's concerned about and he's asked the Court to do whatever it can, if it has any authority or persuasiveness at all with the facility to have him removed from protective status, Your Honor.

THE COURT:  Thank you.

Mr. Trevino Chavez, if you'll please stand.

Mr. Trevino Chavez, the Court finds based upon the indictment returned by the federal grand jury in this matter and the evidence presented here in open court that the government has established the applicability of the drug offender presumption.  As such, the Court will order you detained without bond pending further proceeding at this time.

Further, with respect to the issue of return to the general population or being maintained in protective custody, the security of yourself and the security of the inmates, I'm not qualified to make that determination or that recommendation.  That is something that I have to rely upon the United States marshals who are in charge, if you will, of the federal facility.  If there's no objection -- yes, ma'am.

MS. KUCERA:  Your Honor, I just wanted to clarify something for the record.  I had the opportunity to speak with Deputy Hicks.  This particular defendant is being housed in the medical unit.  I know that defense counsel had indicated that he was in solitary and I just wanted to make that clear for purposes of the record that it's not a solitary.  He's in the medical unit.

MR. DE LA GARZA:  Your Honor, our understanding is that it's not a medical unit per se.  It's --

THE COURT:  Hold on.  Let's see if some agreement can be reached and see where everybody is if --

DEPUTY HICKS:  This is on the record, Judge.  As far as I was concerned the last I heard he was in medical which is kind of a segregated area.  I can confirm that today and let the Court and both parties know as soon as possible.  It shouldn't take more than --

THE COURT:  All right.  Is he being maintained in, quote, unquote, "protective custody," be it in medical or isolation for his own safety or for the safety of others?

DEPUTY HICKS:  I'd have to answer that as probably a little bit of both.

THE COURT:  All right.  If it's for his own safety and he is willing to take the risks and understands what those risks are, is there objection by the Marshal Service to him being released into the general population?

DEPUTY HICKS:  I'd have to defer that up to a supervisor.

THE COURT:  All right.  That's fine.  If you'll just let me know the answer, but I stand by my position, Mr. De La Garza, that the safety of the jails and other inmates that's beyond my control.  I'm not there.  I don't have all the information.  I could order something, but I don't feel, based upon the information that I have, it would be a fair or equitable decision for anybody.

MR. DE LA GARZA:  We understand.  Thank you.

THE COURT:  All right.  Thank you.

Anything further from the government?

MS. KUCERA:  Nothing further, Your Honor.

THE COURT:  All right.  Anything further from the defense?

MR. DE LA GARZA:  Not at this time, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  Court will stand in recess.

UNITED STATES DISTRICT COURT.)

WESTERN DISTRICT OF TEXAS     )

     I, Kristie M. Davis, Official Court Reporter for the United States District Court, Western District of Texas, do hereby certify that I listened to the audio recording furnished to me by the Magistrate Court and from said recording produced this transcript.  I further certify that the above and foregoing transcript is true and complete to the best of my ability.

     Certified to by me this 25th day of January 2017.


                         */s/ Kristie M. Davis*
                         KRISTIE M. DAVIS
                         Official Court Reporter
                         800 Franklin Avenue, Suite 316
                         Waco, Texas 76701
                         (254) 754-7444
                         kmdaviscsr@yahoo.com

34

GILBERTO LIMON, JR.

Direct Examination by Ms. Kucera......................... 3
Cross-Examination by Mr. De La Garza..................... 15

WILLIAM HICKS

Direct Examination by Ms. Kucera......................... 16
Cross-Examination by Mr. De La Garza..................... 21
Redirect Examination by Ms. Kucera....................... 23
Recross-Examination by Mr. De La Garza................... 24